**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN SOO J KO and SANA HAMID ALI, on behalf of themselves and all others similarly situated, | ) ) ) | No. 24 C 1455 |
| | ) | |
| *Plaintiffs*, | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| UNIVERSITY OF THE POTOMAC AT CHICAGO LLC and POTOMAC COLLEGE, LLC, both doing business as University of the Potomac; LINDEN EAST, LLC; ROSANNA DEPINTO, also known as ROSANNA MASTRANTUONO; ARTHUR L. SMITH JR., also known as LEE SMITH; and ANDREA FORD, | ) ) ) ) | |
| *Defendants*. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Susan Soo J. Koo and Sana Hamid Ali enrolled in the Chicago campus of the University of the Potomac ("Chicago UOTP") with the hopes of earning master's degrees in healthcare administration. The only problem, however, is that Chicago UOTP is not authorized to issue degrees. Defendants, collectively three corporate entities and three individual employees of UOTP (the school itself), allegedly misrepresented Chicago UOTP's degree-conferring authority to dupe Plaintiffs into enrolling and paying tuition for a less valuable education. On April 30, 2024, Plaintiffs filed an amended class action lawsuit, alleging claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, common-law negligent misrepresentation, common-law fraudulent concealment, and the Racketeer Influenced And Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). (Dkt. 26). Defendants responded by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 31). For the

1

following reasons, the Court dismisses Defendants the University of the Potomac at Chicago LLC, Potomac College, LLC, Linden East, LLC, Andrea Ford, and Arthur Smith from this case without prejudice. Rosanna DePinto remains as the sole Defendant.

## BACKGROUND

### I.  Factual Background

UOTP is a private, for-profit higher-education institution with campuses in Chicago, Illinois, Washington D.C., and Falls Church, Virginia. (Dkt. 26 ¶¶ 9, 18). Throughout the course of the controversy, three corporate entities all did business as UOTP "without distinction between the entities": (1) Defendant University of the Potomac at Chicago, LLC, an Illinois limited liability company with an office in Washington D.C. whose existence was terminated on August 11, 2023; (2) Defendant Potomac College, LLC, a Delaware limited liability company with offices in Washington, D.C., Virginia, and Texas; and (3) Defendant Linden East, LLC, a Delaware limited liability company with an office in Texas. (*Id.* at ¶¶ 7–8, 11, 16). Linden East owned 100% of the University of the Potomac at Chicago, LLC prior to its termination and is the 100% equity owner of Potomac College, LLC. (*Id.* at ¶ 13). Prior to June 25, 2020, the now-dissolved company Business Industrial Resources ("BIR"), another Linden East entity, owned Chicago UOTP while Linden East operated it. (*Id.* at ¶¶ 14–15). After BIR dissolved, Potomac College, LLC acquired Chicago UOTP. (*Id.*)

According to the Complaint, these various corporate entities all had a hand in deceiving students about Chicago UOTP's degree programs. From 2019 to 2023, the Illinois Board of Higher Education ("IBHE") only authorized Chicago UOTP to offer non-degree programs. (*Id.* at ¶ 24; Dkts. 26-1, 26-2). On August 14, 2019, IBHE notified Chicago UOTP that its application to issue degrees had deficiencies. (Dkt. 26 ¶ 25). About a year later, on September 21, 2020, IBHE

informed Defendant Andrea Ford, the Chief Operating Officer and later, Chief Executive Officer of UOTP, that Chicago UOTP "does not have approval to operate as a degree granting institution." (*Id.* at ¶ 26; Dkt. 26-4). The degree-conferring component is especially relevant for foreign students, whose visa statuses depend on attending a degree-granting institution that complies with state and federal requirements. (*Id.* at ¶ 34).

On August 21, 2019, the U.S. Immigration and Customs ("I.C.E.") sent a "Request for Evidence" letter to UOTP, inquiring why the institution reported students with Illinois addresses as full-time attendees at its Washington D.C. campus. (*Id.* at ¶ 33b). UOTP replied that those Illinois students were enrolled in its programs but lived a long distance away. (*Id.*) In a subsequent letter, dated September 21, 2022, I.C.E. informed UOTP that it had never been certified to enroll and instruct foreign students and to issue Form I-20s, forms that provide educational information about foreign students' visa statuses. (Dkt. 26-5 at 5; Dkt. 26-12). UOTP should have been aware of this fact as it had gone through the certification process for its two other campuses in Washington D.C. and Virginia. (Dkt. 26-5 at 5).

Yet, despite the repeated inquiries and notifications that Chicago UOTP lacked degree-conferring authority, the institution represented otherwise. It told its enrolled and prospective students that the institution "could grant degrees" and enrolled them in "degree-granting programs." (*Id.* at ¶ 30). On three separate occasions—May 10, May 13, and June 4 of 2019—several employees of UOTP, including Defendant Rosanna DePinto, the campus director who managed Chicago UOTP, sent emails referencing Chicago UOTP's degree programs. (*Id.* at ¶¶ 20, 31b; Dkt. 26-6). Specifically in the June 4, 2019 email, DePinto stated that several students had reached out to her about Chicago UOTP's degree programs and, to assist with enrollment, offered tuition reductions for various students. (Dkt. 26-6 at 4).

3

During the alleged fraudulent scheme, Chicago UOTP had 100–367 students enrolled in degree programs. (*Id.* at ¶ 31a). Plaintiff Sana Hamid Ali, an Indian national, received and relied upon these emails to enroll in Chicago UOTP's healthcare administration master's degree program in January 2020. (Dkt. 26 ¶ 45; Dkt. 26-11). From January 2020 to about March 2022, she received periodic I.C.E. forms, like Form I-20, stating that she was enrolled in the master's program with UOTP's Washington D.C. address listed. (Dkt. 26 ¶ 46). On April 12, 2022, UOTP issued a "Curriculum Practical Work authorization" to Ali, stating that she was enrolled in UOTP's master's program with the Washington D.C. address listed again. (*Id.* at ¶ 47). That same month, Ali requested from UOTP documents related to her enrollment at the Chicago campus, which cannot be issued without IBHE approval first. (*Id.* at ¶ 48). But Ali never received those papers. (*Id.* at ¶ 49). Instead, DePinto transferred Ali's enrollment to the University of the Cumberlands, without Ali's consent or knowledge, and issued enrollment documents from the new institution. (*Id.*) Ali's enrollment needed to be transferred, allegedly, because Chicago UOTP could not issue degrees. (*Id.* at ¶ 50).

Ali was not the only alleged victim. In August 2019, DePinto announced to dozens of foreign students enrolled in Chicago UOTP's English as a Second Language classes, including Plaintiff Susan Soo J. Ko, a South Korean national, that the Chicago campus would be offering degree programs in the fall. (*Id.* at ¶¶ 5, 31c). Students asked DePinto about the necessary Form I-20 paperwork for visa purposes, in which DePinto responded that the students would be covered. (*Id.*) Relying on DePinto's announcement, Soo enrolled in Chicago UOTP's healthcare administration master's program in September 2019 and received a "degree" in April 2022. (*Id.* at ¶ 36). Yet, when Soo requested an enrollment letter to display her qualifications for employment,

she learned that Chicago UOTP was not authorized to issue degrees for her program. (*Id.* at ¶¶ 41–42).

UOTP made additional representations about its degree-conferring authority. During September and October 2020, UOTP hosted virtual roundtable discussions with its students, including Plaintiffs Soo and Ali. (*Id.* at ¶ 31d). A purpose behind these discussions were to invite questions regarding students' "academic degree programs [and] courses." (*Id.*) On October 1, 2020, Ford, DePinto, and Defendant Arthur L. Smith, Jr., the Provost of UOTP and Dean of Academics at the Chicago campus, and another employee attended a discussion. (*Id.*) There, UOTP representatives referenced Chicago UOTP's degree programs, and when students expressed concerns regarding the I.C.E. paperwork, the representative stated that it was still authorized to issue those requisite visa papers. (*Id.*) There is no allegation that Ford or Smith made any comments about the degree programs at this discussion.

Separately, in various Facebook posts, Chicago UOTP repeatedly referenced the word "degree"—either in posts asking whether you were "interested in returning to school to complete your degree or starting a new degree" or hashtags like "#degreeprogram," "#bachelorsdegree," "#onlinedegree," and "#mastersdegree." (*Id.* at ¶ 31e; Dkt. 26-8).

As a result of this alleged fraud, Plaintiffs Soo and Ali claim that they suffered damages, including significant sums of tuition and costs to attend Chicago UOTP, lost wages, damage to credit, and diminution of value in their course credits and degrees. (Dkt. 26 ¶ 75). Thus, they filed a class action complaint alleging that Defendants are liable under ICFA, negligent misrepresentation, fraudulent concealment, and the RICO Act. (*See id.* at ¶¶ 63–136).

**LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

## DISCUSSION

### I.    Illinois Consumer Fraud and Deceptive Business Practices Act (Counts I, II, and III)

In Counts I, II, and III, Plaintiffs claim that Defendants' misrepresentations and failures to disclose their inability to issue degrees are deceptive and unfair, in violation of ICFA. To plead an ICFA claim, a plaintiff must allege: (1) "that the defendant committed a deceptive or unfair act"; (2) "with the intent that others rely on the deception"; (3) "that the act occurred in the course of trade or commerce"; and (4) actual damages; (5) proximately caused by the deception. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)); *DOD Techs. v. Mesirow Ins. Servs., Inc.*,

887 N.E.2d 1, 10 (Ill. 2008). The statute permits claims of "either deceptive conduct or unfair conduct (or both)." *Benson*, 944 F.3d at 646.

### A. Deceptive Conduct

Deceptive conduct under ICFA "creates a likelihood of deception or has the capacity to deceive." *Id.* (quoting *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001)). Plaintiffs' deception claim is premised on two theories: (1) Defendants misrepresented the institution's ability to confer degrees and (2) Defendants failed to disclose the material fact that Chicago UOTP was not authorized to issue degrees. In response, Defendants argue that Plaintiffs' impermissible use of "group pleading" fails to satisfy Rule 9(b).

For claims "rest[ing] on allegations of deceptive conduct," Rule 9(b) requires the plaintiff to "plead with particularity the circumstances constituting fraud." *Id.* (citing *Vanzant*, 934 F.3d at 736). Or otherwise put, plaintiffs need to describe the "who, what, when, where, and how" of the fraud—" the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quotation omitted). But Rule 9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " *Id.* at 442 (internal quotation omitted).

The demand for particularity can conflict with a plaintiff's use of group pleading—allegations of fraud where the complaint does not explain the role of the different defendants. *See Walls v. Vre Chicago Eleven, LLC*, 2016 WL 5477554, at *9 (N.D. Ill. Sept. 29, 2016); *F.D.I.C. v. Saphir*, 2011 WL 3876918, at *8 (N.D. Ill. Sept. 1, 2011) ("[T]he case law the court has located expresses disapproval of 'group pleading' in cases alleging fraud…"). That is because the "most

basic consideration" of Rule 9(b)'s heightened pleading standard is to "provide fair notice to each individual Defendant concerning the nature of his or her alleged participation in the fraud." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) ("Therefore, in a case involving multiple defendants, such as the one before us, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.' " (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987))). In other words, a plaintiff alleging fraud cannot lump together multiple defendants. *Vicom*, 20 F.3d at 778.

### a. Corporate Defendants

Even upon reviewing the Complaint in the light most favorable to Plaintiffs, the Court can only arrive at the conclusion that the corporate Defendants were impermissibly lumped together. There is no indication as to which corporate Defendant did what action and how they participated in the fraud. Simply stating that University of the Potomac at Chicago, Potomac College, and Linden East all do or did business as UOTP "without distinction between entities involved in the various campuses" does not meet the basic consideration of Rule 9(b)—fair notice. It must be true that not every single aspect about UOTP is fraudulent, especially as the allegations center on the Chicago campus. So stating that all three corporations did business as UOTP does not equate to all three corporations committing some or all of the alleged fraudulent acts. *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (affirming district court's dismissal of complaint alleging fraud where "the complaint lump[ed] all the defendants together and [did] not specify who was involved in what activity").

It could very well be that these Defendants had a hand in making misrepresentations and omissions, but the Complaint is devoid of any allegation that informs each of them the "nature of

[their] alleged participation." *Vicom*, 20 F.3d at 778. For example, the University of the Potomac at Chicago was an Illinois LLC and ceased to exist on August 11, 2023. Potomac College acquired Chicago UOTP on June 25, 2020 from another entity, BIR. Yet, Linden East operated it. These three facts shed no light on how each corporate Defendant misrepresented Chicago UOTP's degree programs, if at all. What is the purpose of the University of the Potomac at Chicago if it neither owns nor operates the Chicago campus? And with this supposed lack of authority, it strains credibility to attribute any fraudulent actions to the University of the Potomac at Chicago. Moreover, several specific instances of misrepresentations occurred before Potomac College acquired the Chicago campus, yet Plaintiffs suggests the Court can attribute those communications to it. What the Court needs, and what Rule 9(b) demands, are specific details about some fraudulent conduct tied to each corporate Defendant rather than general sweeping statements. Thus, the Court grants the motion to dismiss the corporate Defendants under Counts I and II.

### b. Andrea Ford and Arthur Smith

Allegations against Ford and Smith suffer from the same deficiencies as the ones against the corporate Defendants. For the most part, Plaintiffs allegations— stating that they "authorized, approved, participated in and directed" representations that UOTP could grant degrees and "directed and authorized" misrepresentations and communications containing omissions, (Dkt. 26 ¶¶ 30, 72, 86)—do not rise to the level of particularity as demanded by Rule 9(b). Plaintiffs reference several Facebook postings and hashtags and various communications about Chicago UOTP's degree programs but there are no details of specific fraudulent actions—like

conversations, emails, or advertisements to students—that can be attributed to Ford or Smith. In sum, the Complaint is lacking the "who, what, when, where, and how."

As a rebuttal, Plaintiffs point to the October 1, 2020 roundtable discussion with Ford, Smith, DePinto, and another UOTP representative present. During this conversation, the UOTP representatives "referred to the degree programs at the Chicago campus." (Dkt. 26 ¶ 31d). Yet, there are no allegations that Ford or Smith made any statements or comments about the degree programs. To navigate around this quandary, Plaintiffs frame their argument as during the entire conversation, Ford and Smith —who allegedly knew that Chicago UOTP was unauthorized to grant degrees—remained silent. And such silence, the argument goes, amounts to an omission.

That is a stretch. Under ICFA, "the plaintiff must actually be deceived by a statement or omission that is made by the defendant." *De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009). "If there has been no communication with the plaintiff, there have been no statements and no omissions." *Id.* Accordingly, a plaintiff cannot maintain an ICFA claim if the "plaintiff does not receive, directly or indirectly, communication or advertising from the defendant." *Id.* In the omission context, "an omission is an omission from a communication, rather than a general failure to disclose." *Darne v. Ford Motor Co.*, 2017 WL 3836586, at *10 (N.D. Ill. Sept. 1, 2017) (cleaned up). Here, Plaintiffs only allege that Ford and Smith attended the roundtable discussion, but there are no details that they made some direct statement or communication where they omitted a material fact. *See, e.g., Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 822 (7th Cir. 2018) (holding that the plaintiff, in alleging that the defendant failed to warn consumers of its compromised payment system, "cannot rest on vague accusations about inadequate disclosures," but instead "must actually identify a deceptive guarantee about data security in order to state an ICFA claim"); *Bondick v. Ricoh Imaging Americas Corp.*, 2022 WL 2116664, at *4 (N.D. Ill. June

13, 2022) (dismissing an omission-based ICFA claim where "[t]here [wa]s no other alleged direct communication" other than the defendant's "holding out" their product "accurately…through a third-party retailer"); *Guajardo v. Skechers USA, Inc.*, 2021 WL 4302532, at *3 (C.D. Ill. Sept. 21, 2021) (dismissing an omission-based ICFA claim where the plaintiff "did not allege any direct statements that contained material omissions, only opportunities or locations where Skechers could have disclosed the alleged defect," such as "advertising, labeling, and packaging") (cleaned up)); *O'Connor v. Ford Motor Co.*, 477 F. Supp. 705, 719–20 (N.D. Ill. 2020) (holding that the plaintiff did not state an omission-based ICFA claim where he alleged that the defendant failed to disclose dangers posed by its vehicles, but "d[id] not identify any particular direct statements from [the] [d]efendant that contain[ed] material omissions"). Plaintiffs' characterization of Smith's and Ford's silence sounds more in the register of a general failure to disclose, which is insufficient to sustain an ICFA-omission claim.[1]

Plaintiffs' responses to Defendants' challenges do not move the needle. In two sentences, Plaintiffs state, without mentioning any case citation or Rule 9(b)'s heightened pleading standard as related to group pleading, that they did not impermissibly lump together all Defendants. (Dkt. 34 at 9). They direct the Court's attention to each count where Plaintiffs attributed specific acts to each individual. On this barebones rebuttal alone, the Court feels compelled to find that Plaintiffs waived this argument. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). But even looking at the specific counts, the Court does not see where these specific acts attributable to individual Defendants are enumerated. Again, there is no distinction among the

---

[1] The alternative view is the silence is an adoption of the misrepresentation. But again, under ICFA, Ford or Smith must make some statement that is communicated to Plaintiffs. *De Bouse*, 922 N.E.2d at 316. And Plaintiffs have failed to make such allegations.

various corporate Defendants and what supposed deceptive acts each one committed. As for the individual Defendants, Plaintiffs repeat the same conclusory allegations that Ford and Smith "directed and authorized" misrepresentations and communications containing omissions. (Dkt. 26 ¶¶ 72, 86). But there are no facts suggesting what communications did Ford and Smith direct or authorize or when did they direct or authorize the communications. Again, a lack of details.

Separately, Plaintiffs ask for the particularity requirement under Rule 9(b) to be relaxed as they do not have the knowledge to plead, with specific details, which roles individual Defendants played in the fraudulent acts.[2] True, courts have relaxed the standards when "details of the fraud are 'within the defendant's exclusive knowledge.' " *Gaudie v. Potestivo Appraisal Servs., Inc.*, 837 F. Supp. 2d 799, 804 (N.D. Ill. 2011) (quoting *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994)). But the Court is not convinced how it is possible that Plaintiffs do not have knowledge of specific misrepresentations and omissions that Ford or Smith made to them. Thus, the Court also dismisses Ford and Smith under Counts I and II.

### c. Rosanna DePinto

By way of contrast, Plaintiffs have alleged, with particularity, two separate instances that support a deception claim against DePinto. The first is the June 4, 2019 email from DePinto to the student body, stating that she has been receiving emails and questions about Chicago UOTP's degree programs and, instead of correcting the misrepresentation that Chicago UOTP is not allowed to issue degrees, urges students to take advantage of the tuition reduction and enroll in the institution. The second instance is in August 2019, when she gathered several foreign students to Chicago UOTP's breakroom and announced that the Chicago campus would be offering degree

---

[2] Plaintiffs frame this request as referring to "Defendants," as if to include the corporate Defendants. But the section where this argument is presented discusses only the individual Defendants. (Dkt. 34 at 1–4). Thus, the Court assumes that Plaintiffs are addressing only the individual Defendants.

programs, despite the lack of approval from IBHE to do so. Thus, Plaintiffs have sufficiently alleged the who, what, when, where, and how of several deceptive acts with particularity.

Defendants raises several defenses: (1) that neither of the alleged communications were deceptive; (2) that neither Plaintiffs relied on those communications; (3) that Plaintiffs failed to plead intent to defraud; (4) that Plaintiffs failed to allege that DePinto had knowledge of Chicago UOTP's inability to issue degrees; and (5) that DePinto, as a corporate officer, is not liable for the torts committed by the corporate Defendants. But none are persuasive.

First, Plaintiffs have sufficiently alleged deception. In analyzing the likelihood of deception, the Court applies the "reasonable consumer" standard and looks at the deceptive act "in light of the totality of the information made available to the plaintiff." *Benson*, 994 F.3d at 646 (citations omitted). At the announcement, DePinto explicitly stated that Chicago UOTP had the ability to offer degrees when IBHE had never given them such authority. And viewing the entire June 4, 2019 email, the Court finds that a reasonable consumer could believe that Chicago UOTP offered degrees after DePinto mentioned the degree programs to entice prospective students to enroll in the Chicago campus.

Next, Plaintiff Soo alleged that she did rely upon DePinto's in-person announcement. But even if she did not plead reliance, it "is not an element of statutory consumer fraud." *Vanzant*, 934 F.3d at 739 (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996)). The focus is the damage, not the purchase, that must occur because of a deceptive act or practice. *Id.* (citing *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002)). Thus, it is sufficient that Ali and Soo

pleaded that they enrolled in Chicago UOTP after DePinto made "the allegedly fraudulent statements." *Id.* (quoting *Connick*, 675 N.E.2d. at 595).

Moreover, Plaintiffs do not need to plead an intent to defraud or deceive. Under ICFA, "[i]t is enough to allege that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 (7th Cir. 2012). Here, Plaintiffs have pleaded sufficient facts for the Court to infer that the two sets of communications used the phrase "degree programs" so prospective students would rely on Chicago UOTP's ability to issue degrees to enroll. *See, e.g.*, *Siegal v. GEICO Cas. Co.*, 523 F. Supp. 3d 1032, 1043 (N.D. Ill. 2021) ("GEICO certainly intended that consumers rely on the GEICO Giveback program in deciding to purchase or renew a policy, which is the very purpose of corporate promotions.").

As for knowledge, Rule 9(b) provides that knowledge "may be averred generally." Fed. R. Civ. P. 9(b); *see also Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013). As campus director for Chicago UOTP, DePinto was tasked to manage and run that campus and had interactions with Ford and Smith, the CEO and Provost of UOTP respectively, where they collectively attended discussions about Chicago UOTP's degree programs. Thus, it is reasonable to infer that she would have been aware of the institution's degree-conferring status. And at the pleadings stage, "an inference is enough." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 778 (7th Cir. 2016) (quoting *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 839 (7th Cir. 2013)).

Lastly, under Illinois law, "a corporate officer is individually liable for fraudulent acts of his own or those of the corporation in which he participates, not a corporation's torts." *City of Chicago v. Equte LLC*, 693 F. Supp. 3d 879, 895 (N.D. Ill. 2023) (quoting *Express Valet, Inc. v.*

14

*City of Chicago*, 869 N.E.2d 964, 976 (Ill. App. Ct. 2007)) (cleaned up). As discussed, the Court has found that Plaintiffs have pleaded sufficient facts to show that DePinto took specific actions that made her personally liable for fraud. Thus, the motion to dismiss DePinto for Counts I and II is denied.

### B. Unfair Conduct

In addition to covering deceptive acts and fraud, ICFA also prohibits "[u]nfair methods of competition and unfair…acts or practice… in the conduct of any trade or commerce." 815 Ill. Comp. Stat. 505/2. "To determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.' " *Vanzant*, 934 F.3d at 738–39 (quoting *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014)). "Although the [test] seems to suggest that all three prongs…must be met," conduct "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.' " *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) (quotation omitted). Lastly, the plaintiff must plead causation—"but for the defendant's deceptive or unfair conduct, he 'would not have been damaged.' " *Vanzant*, 943 F.3d at 739 (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010)). Determining whether a practice is unfair under ICFA requires "a case-by-case analysis." *Siegel*, 612 F.3d at 935.

Here, Defendants argue that Plaintiffs again used impermissible group pleading for their unfair claim. Defendants go on to contend that Plaintiffs also failed to allege an unfair or oppressive conduct, intent for reliance on that conduct, and proximate causation.

The tension between group pleading and Rule 9(b) comes into play here again. Although Plaintiffs are alleging an unfair conduct, that allegation is premised on the primary claim that

15

Defendants utilized fraudulent misrepresentations. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) ("Camasta claims that he was induced to purchase shirts from JAB by their 'fraudulent sales practices' that 'mislead,' 'misrepresent,' and 'defraud.' While Camasta adds language of unfairness, his allegations of 'unfair practice' are clearly premised upon the primary claim that JAB utilized a fraudulent sales technique. Simply adding language of 'unfairness' instead of 'misrepresentation' does not alter the fact that Camasta's allegations are entirely grounded in fraud under the ICFA."); *Fleury v. Gen. Motors LLC*, 2023 WL 3792411, at *7 (N.D. Ill. June 2, 2023) ("Notably, Rule 9(b) applies to Fleury's repleaded unfairness claim since it depends on allegations that GM failed to disclose a defect, sounding in fraud."); *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1039 (N.D. Ill. 2007) ("This heightened pleading standard applies to all averments of fraud, regardless of whether those averments pertain to a 'cause of action' for fraud." (cleaned up)).

As with Plaintiffs' deceptive claim, the unfair one suffers from a similar flaw. At its core, Plaintiffs' argument is that Defendants' alleged misrepresentations and omissions about Chicago UOTP's ability to issue degrees are also unfair. But underpinning that unfair accusation is the alleged fraud and the Court must evaluate the unfair claim through the lens of Rule 9(b). So as applied to the corporate Defendants, the operative question is not whether the practice is unfair but whether those Defendants committed that practice. And as discussed in the prior section, Plaintiffs have failed to allege with particularity the circumstances of how the three corporate Defendants committed unfair acts at all. In short, Plaintiffs failed to delineate the roles of each corporate

Defendant and what actions they specifically took to engage in the unfair practice. The corporate Defendants are similarly dismissed for Count III.

As for Ford and Smith, the Complaint contains very few allegations on their specific unfair actions. The closest one, as discussed, is the roundtable discussion where there was a conversation about degree programs but there was no indication of what Ford or Smith said. Plaintiffs' argument—that they engaged in an unfair practice by remaining silent—is premised on an omission of material fact. But there can be no omission if there was never any communication from Ford of Smith to Plaintiffs. Thus, Ford and Smith are also dismissed from this Count.

But, as discussed, DePinto still remains because she did make several misrepresentations and omissions in communications to prospective students. Thus, the Court will evaluate whether the alleged conduct was unfair.

A business practice "offends public policy as established by statutes, the common law or otherwise, or, in other words, whether it is at least within the penumbra of some established concept of unfairness." *Ekl v. Knecht*, 585 N.E.2d 156, 163 (Ill. App. Ct. 1991).[3] Here, Plaintiffs allege that DePinto engaged in unfair acts when she used Chicago UOTP's alleged ability to grant degrees to entice prospective students to enroll while knowing that the institution does not have the authority to do so. In other words, this practice constitutes "false advertising, which is unethical and offends public policy." *Benson*, 944 F.3d at 647; *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 672 (7th Cir. 2008) (concluding that the lower court

---

[3] Plaintiffs assert that Defendants' conduct offends public policy as established by 23 Ill. Admin. Code § 1030.60(b)(12), stating that an institution cannot publish misleading or erroneous information about degree-granting status of an institution. At first glance, the Court is unsure of whether such a statute applies to an individual like DePinto. As the Court finds that the conduct violates public policy on other grounds, the Court declines to address this issue.

erred in dismissing plaintiffs' unfair practices claim where defendant disseminated false advertisements).

Defendants focus the bulk of their argument on the next factor: "[c]onduct is immoral, unethical, oppressive, or unscrupulous for ICFA purposes if it 'leave[s] the consumer with little choice except to submit to it.' " *Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 715 (N.D. Ill. 2018) (quoting *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002–03 (7th Cir. 2018)). For example, oppression occurs where a "consumer is forced to choose between paying a greater amount and losing a previously promised benefit." *Id.*; *see Newman*, 885 F.3d at 1003 (noting oppressive conduct where a consumer had to choose between forfeiting "sunk costs" and paying unexpectedly higher expenses); *Batson*, 746 F.3d at 834 (recounting a case where a consumer must choose between losing his investment and obtaining an overpriced product he did not want) (citing *Thompson v. Fajerstein*, 2008 WL 4279983, at *5 (N.D. Ill. Sept. 17, 2008)); *Wendorf v. Landers*, 755 F.Supp.2d 972, 979 (N.D. Ill. 2010) ("Courts interpreting the meaning of 'unfair practices' have held that a plaintiff states a claim under the ICFA where the defendant's conduct gave plaintiff no reasonable alternative to incurring a charge or penalty.").

Defendants argue that Plaintiffs' Complaint is missing the "key allegation" that they had no " 'meaningful choice' but to enroll in" the degree program. (Dkt. 31 at 9). But what is a meaningful choice requires context, particularly when that choice is made. *Newman v. Metropolitan Life Insurance Company* is instructive here. There, relying upon defendant's brochure, the plaintiff enrolled in a life insurance plan where she would pay an elevated premium prior to turning 65, and then a discounted premium afterward. *Newsom*, 885 F.3d at 997. The plan worked for a while, but upon turning 67, defendant doubled plaintiff's premium. *Id.* In arguing that the premium raise was not an unfair conduct, the defendant stated that the plaintiff had

meaningful choices: "accept reduced benefits, get a new plan, or let the policy lapse and rely on the contingent coverage rider she purchased." *Id.* at 1003. The Seventh Circuit rejected those choices as meaningful because each proposal required the plaintiff to "forfeit eight years of sunk cost"—she would not reap the reward of paying an elevated premium. *Id.* The same Hobson's choice exists here—Plaintiffs enrolled in Chicago UOTP because DePinto stated that they offered degree programs. Plaintiffs only discovered that they were misled after paying several years of tuition. At that point, the only available choices were to either to accept a worthless "degree" or start their education over again. Either option cannot be characterized as meaningful. Thus, the Court finds that Plaintiffs have alleged sufficient facts to show that DePinto's false advertising was oppressive.

Finally, Plaintiffs have alleged substantial injury. Plaintiffs paid tuition for several years to UOTP with the expectation that they would receive degrees for future employment. Yet, upon graduating, they discovered that they could not use their "degrees" to get employment. Thus, Plaintiffs' Complaint alleges sufficient facts to plausibly show that Plaintiffs paid more than the actual value of the product. *See Benson*, 944 F.3d at 648 (citing *Camasta*, 761 F.3d at 740).

The Court will quickly dispense with Defendants' intent and proximate causation argument. As discussed above, Plaintiffs have alleged sufficient facts to show that DePinto intended for Plaintiffs to rely on her false advertisements. And under the proximate-cause element, the Court can plausibly infer that but-for DePinto's unfair conduct, they would not have been damaged. *See, e.g.*, *Saika*, 357 F. Supp. 3d at 718; *see also Haywood v. Massage Envy Franchising*,

LLC, 887 F.3d 329, 334 (7th Cir. 2018) (noting that proximate causation in an ICFA case "is typically an issue of fact unless "only one conclusion is clearly evident").

Lastly, Defendants request that the Court dismisses DePinto pursuant to Illinois law that an officer cannot be personally liable for torts performed by the corporation. As a recap, to plead individual liability, Plaintiffs must allege that an individual "had personal involvement or active participation in the acts resulting in liability, not just…personal involvement or active participation in the management of the corporation." *Equte*, 693 F.Supp.3d at 895 (quoting *People ex rel. Madigan v. Tang*, 805 N.E.2d 243, 253–54 (Ill. App. Ct. 2004)). As discussed in the prior section, Plaintiffs have pleaded sufficient personal involvement in the unfair conduct by DePinto to be found personally liable. The motion to dismiss DePinto under Count III is denied.

## II.    Negligent Misrepresentation (Count IV)

Plaintiffs' Count IV, a negligent misrepresentation claim, runs headfirst into Illinois's economic loss rule, also known as the *Moorman* doctrine. Named after the seminal case *Moorman Manufacturing Co. v. National Tank Co.*, it held that, at least in the product liability sphere, a party "cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." 435 N.E.2d 443, 449, 450 (Ill. 1982); *see, e.g.*, *Walls v. VRE Chicago Eleven*, LLC, 344 F. Supp. 3d 932, 957 (N.D. Ill. 2018) ("Under the *Moorman* doctrine, a party may not recover in negligence for a purely economic loss."). Rather, "contract law, which protects expectation interests, provides the proper standard when a qualitative defect is involved." *Moorman*, 435 N.E.2d at 448. The Illinois Supreme Court later extended the *Moorman* doctrine to the provision of services. *Loman v. Freeman*, 874 N.E.2d 542, 551 (Ill. App. Ct. 2006), *aff'd*, 890

N.E.2d 446 (Ill. 2008) (citing *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246 (Ill. 1986)).

Illinois courts have carved out three exceptions to the rule: "(1) where the plaintiff sustained damage, i.e., personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e., fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 333–34 (Ill. 2006) (cleaned up).

Defendants argue that Plaintiffs' negligent misrepresentation claim must fail because Plaintiffs seek purely economic loss, like tuition and lost wages, and none of the *Moorman* doctrine exceptions apply here. In response, Plaintiffs make little effort to refute Defendants' position. Instead, they state, in one sentence, that another case in this District, *Dunagan v. Illinois Institute of Art*, allowed the plaintiff's negligent misrepresentation claim to proceed. And without providing any case support or even referencing *Moorman*, Plaintiffs argue, in two sentences, that Chicago UOTP engages in a business of supplying information because Illinois statute requires the institution to supply accurate information to "prospective students, faculty, staff or the public." (Dkt. 34 at 11).

The underdeveloped and cursory nature behind Plaintiffs' rebuttal justifies the Court to find that Plaintiffs waived those arguments. *See Judge*, 612 F.3d at 557. But even on their merits, the Court is hard-pressed to find them persuasive. To start, *Dunagan* cannot bear the weight of Plaintiffs' proposition, especially since *Dunagan*, in the entire two-page order, fails to mention the *Moorman* doctrine at all and only references negligent misrepresentation once in the introduction.

*See* Order, *Dunagan v. Ill. Inst. Of Art-Chicago, LLC*, 19-cv-00809 (N.D. Ill. Jan. 6, 2020), ECF No. 68. Moreover, without any relevant citations or analysis to review, the Court is skeptical that UOTP falls under the supplying-information exception. "The key inquiry in determining whether the information provider exception to the *Moorman* doctrine applies 'is whether the defendant is in the business of supplying information for the guidance of others, or whether the information that is supplied is merely ancillary' to the ultimate work product." *F.D.I.C. v. Masarsky*, 968 F. Supp. 2d 915, 924 (N.D. Ill. 2013) (citing *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1201 (Ill. 1997)); *see also, Turner v. GAC Star Quality, LLC*, 671 F. Supp. 3d 897, 905 (N.D. Ill. 2023). While UOTP has an obligation to provide accurate information—a violation that Plaintiffs have pursued under ICFA—Plaintiffs have not alleged any facts or arguments to suggest that UOTP is in the business of supplying information. Rather, providing information appears to be ancillary to the ultimate product—an education. Thus, Plaintiffs' negligent misrepresentation claim is dismissed.

### III.    Fraudulent Concealment (Count V)

To plead a fraudulent concealment claim in Illinois, Plaintiffs must plead "that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick*, 675 N.E.2d at 591. This claim is cabined to just the corporate Defendants. But allegations of fraudulent concealment are subject to Rule 9(b) heightened standards and, as discussed under Plaintiffs' ICFA-deception claim, Plaintiffs have failed to provide specific details as to which

Defendant engaged in fraudulent concealment and how they did it. Thus, the Court dismisses Count V.

## IV.    Civil RICO (Count VI)

Finally, Plaintiffs allege that the individual Defendants violated § 1962(c). Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017). The Court will apply the ordinary Rule 8(a) pleading requirements to the non-fraud elements of Plaintiffs' RICO claim and Rule 9(b) to the mail and wire fraud allegations for Plaintiffs' pattern of racketeering activity. *See Kostovetsky v. Ambit Energy Holdings, LLC*, 2016 WL 105980, at *3 (N.D. Ill. Jan. 8, 2016).

### A.  Enterprise

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the

statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Defendants' argument that Plaintiffs failed to allege a structure, organization, hierarchy, or purpose of the enterprise is not effective. To allege an enterprise, Plaintiffs do not need to spell out a structure or hierarchy. *Boyle*, 556 U.S. at 948. As the Supreme Court recognized, "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.* Thus, it rejected the concept that such a group needed a hierarchical structure or "chain of command" and "decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Id.*; *see, e.g., Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1093–94 (N.D. Ill. 2016); *Nesbitt v. Regas*, 2015 WL 1331291, at *6 (N.D. Ill. Mar. 20, 2015) (noting that *Boyle* abrogated a body of Seventh Circuit case law requiring a more discernible structure and hierarchy for RICO enterprises).

The relationships among the members are straightforward: at one point in time, Linden East owned both the University of the Potomac at Chicago and Potomac LLC, and they collectively do business as UOTP. The individual Defendants are all employees of the three corporate Defendants, with Ford operating as the CEO of the university and Smith and DePinto running Chicago UOTP. And although the purpose of the enterprise is not entirely clear from the Complaint, Plaintiffs later clarified in their response that its purpose is "the operation of an institution of higher education which offered bachelors degrees and masters degrees." (Dkt. 34 at 12); *see Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) (noting that courts may consider additional facts set forth in a response opposing dismissal if the facts are consistent with the

pleadings). And Defendants do not dispute that the longevity requirement has been met. Thus, Plaintiffs have reasonably pleaded a plausible enterprise.

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citation omitted); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or participated in the conduct of the enterprise's affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context, conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179). This operation-or-management requirement is not limited to the enterprise's upper management, but extends to lower-rung participants and third-party outsiders who play a role in managing or operating the enterprise. *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021). But "[a]llegations that a defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise" do not suffice to meet this operation-or-management requirement. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009); see id. ("The [RICO] statute does not penalize tangential involvement in an enterprise."). "The *Reves* 'operation-management' test is deployed to include and exclude certain RICO defendants." *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 626 (N.D. Ill. 2020).

Here, Defendants argue that Plaintiffs failed to allege that the individual Defendants asserted control over or acted on behalf of an alleged enterprise, as opposed to performing their job duties. But those job duties are relevant to showcasing that the individual Defendants had control over UOTP's affairs. *See cf. United States v. Cummings*, 395 F.3d 392, 398 (7th Cir. 2005)

(indicating that there was no evidence, like official duty positions or scope of duties, on the record to support an operator or manager role in the enterprise). For example, the function of the UOTP enterprise is to operate an institution of higher education that offered degrees, so Ford's, Smith's, and DePinto's positions, as CEO, Provost and Dean of Academics, and director of the Chicago campus respectively, allows the Court to infer that they have some operation or management roles in conducting its affairs. But beyond titles, Plaintiffs allege that DePinto contacts students about UOTP's degree programs and answers questions regarding enrollment for foreign students, including the alleged misrepresentations in this case. She has offered various tuition plans to entice students to enroll in the university and controls the process of requesting and delivering enrollment papers to students, as evidenced by her ability to surreptitiously swap the accrediting institution from Chicago UOTP to another university in Ali's case. *See, e.g.*, *Menzies*, 197 F. Supp. 3d at 1103 (finding the conduct prong satisfied where the defendant, among other acts, lured plaintiff into a bogus tax shelter plan and defrauded plaintiff through false statements and opinion letters).

While there are less details regarding Ford and Smith, Plaintiffs only need to meet the lower bar of notice-pleading. And under that standard, Plaintiffs have done enough. Ford and Smith serve as senior positions within the university and allegedly authorized the university to publish various communications about Chicago UOTP's degree programs. Plaintiffs allege that Ford handled all communications in the degree accreditation process with IBHE, which goes to the purpose of Chicago UOTP's existence as an institution of higher education. And Smith was similarly tasked to oversee the academic and administrative operations of the Chicago campus as its Dean of Academics. Moreover, the individual Defendants collectively portrayed themselves as representatives of UOTP. *See United States v. Shamah*, 624 F.3d 449, 455 (7th Cir. 2010) (holding that "lowly" police officers were operators for RICO purposes given their authority over

department affairs and acting as representatives of the enterprise, the larger police force). In total, the alleged conduct suggests more than the mere "tangential involvement" in the enterprise's affairs. *Crichton*, 576 F.3d at 399.

It is further worth noting that, at this preliminary stage, Plaintiffs have pleaded sufficient facts to suggest that the individual Defendants were able to commit the alleged fraud because of their leadership positions in the enterprise, including the ability to keep the alleged scheme alive for several years. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010) (holding that a RICO offense "is using an enterprise to engage in a pattern of racketeering activity"). As how the Complaint is currently framed, it is plausible that the individual Defendants "improperly hijack[ed] the business operations of their companies for illicit ends." *Walgreens*, 719 F.3d at 855.

The Court notes that Defendants may be arguing a point separate than whether a person has control over an enterprise's affairs. In their motion to dismiss, they briefly state that the Complaint failed to allege that the individual Defendants "participated in an enterprise engaged in criminal activity." (Dkt. 31 at 14). In their reply, their sole argument for the failure to allege a RICO enterprise is premised on the issue that Plaintiffs do not allege an illegal enterprise. (Dkt. 35 at 6). Since Plaintiffs stated that the common purpose of the enterprise was to operate an institution of higher education—the normal purpose for any for-profit company operating universities—Plaintiffs failed to allege that the individual Defendants' cooperation was "anything other than what was required of them to operate an institution of higher learning, as opposed to a separate criminal enterprise." (*Id.*) For support, Defendants cite (1) *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010), citing the three structural features of an enterprise; (2) *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995), explaining

27

that an enterprise must be more than a group of individuals operating in concert under the control of one person; and (3) in a footnote, *Joe Schroeder Legacy, LLC v. Serv. 247 of Illinois, Inc.*, 2022 WL 408272, at *8 (N.D. Ill. Feb. 10, 2022), finding that the Court dismissed a past case where the plaintiffs failed "to distinguish between the illicit purpose of the alleged enterprise and the lawful purposes of the Defendants."

As the Court understands it, Defendants are arguing that for there to be a RICO violation, the enterprise itself must have an illegal purpose or course of conduct. Yet, Defendants' citations do not support that assertion. Thus, Defendants are making this argument without any relevant support. *See, e.g., Baker v. Colvin*, 2015 WL 719604, *4 (N.D. Ill. Feb. 18, 2015) (noting that "undeveloped" arguments, which rely on "passing references" to legal rules "without providing any substantive support," are deemed waived). But even on the merits, the Court is skeptical that Defendants' position is correct. The Supreme Court held that an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Nothing within the opinion says that the purpose or the course of conduct must be fraudulent. Rather, it is the pattern of racketeering activity that is the series of criminal activities. *See generally id.* Moreover, well-established precedent states that RICO covers "both legitimate and illegitimate enterprises." *Id.* at 580.

Defendants have not presented, and the Court is unaware of, any precedent that directly addresses this point, but the Court notes that its view is supported by its sister courts. *See, e.g.*, *United States v. Cianci*, 378 F.3d 71, 83 (1st Cir. 2004); *United States v. Kelly*, 609 F. Supp. 3d 85, 125 (E.D.N.Y. 2022); *Kruse by & through Kruse v. Repp*, 543 F. Supp. 3d 654, 680 (S.D. Iowa 2021); *but see First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (noting that an enterprise "must share a common purpose to engage in a particular fraudulent

conduct") *and Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 652 (N.D. Ohio 2012) ("[T]he Second Circuit requires a common fraudulent purpose in order to allege a RICO enterprise."). In its current form, the Court finds Defendants' argument underdeveloped and unconvincing because they present no relevant citations to justify their position. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."). That is not to say that Defendants are wrong, but they have failed to make a compelling case at this time. Defendants are free to re-raise this argument with more substantive briefing at a later stage of litigation.

### B. Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.' " *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, " '[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241)

Defendants do not challenge Plaintiffs' satisfaction of the relationship-plus-continuity test. Rather, they argue that Plaintiffs has failed to adequately plead predicate acts. As predicate acts,

Plaintiffs allege mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 26 ¶ 129). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343. Allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658. So, at a minimum, Plaintiffs must, for each individual Defendant, "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Id.* at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 684 (N.D. Ill. 2012) ("In alleging a RICO pattern, liability is limited to persons who have 'personally committed' at least two predicate acts of racketeering." (citing *Dudley Enterprises, Inc. v. Palmer Corp.*, 822 F. Supp. 496, 502 (N.D. Ill. 1993))).

Starting with Ford and Smith, Plaintiffs have failed to allege two predicate acts of fraud with particularity. As discussed under the ICFA-deception section, the Complaint is devoid of any details of what specific misrepresentations or omissions Ford or Smith made, let alone fraud that involve the mail or wires. Plaintiffs point to various emails and Facebook posts sent by Chicago UOTP and other school representatives, but there is nothing connecting those communications to Ford or Smith. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998) (commenting that a complaint that treats all defendants as one, or lumped together, is "clearly insufficient to

state a RICO claim under § 1962(c)"); *James Streibich Revocable Tr. of 2002 v. Flagstad*, 2021 WL 1546439, at \*8 (N.D. Ill. Apr. 20, 2021) ("In the absence of particular facts to put each corporate defendant on notice for its alleged involvement in the predicate acts, plaintiffs' allegations are insufficient to satisfy Rule 9(b)'s requirements."). Thus, the conclusory allegations that Ford and Smith authorized and directed those misrepresentations or omissions do not meet the stringent standards of Rule 9(b). Ford and Smith are dismissed under Count VI.

Plaintiffs have plausibly alleged two separate predicates acts for DePinto. The first is the June 4, 2019 email from DePinto to the student body, stating that she received emails about Chicago UOTP's degree programs and, instead of correcting the misrepresentation that Chicago UOTP was not allowed to grant degrees, urged students to enroll in the institution through various tuition reductions. The second one was the August 2019 announcement by DePinto that the Chicago campus would be offering degree programs in the fall. Although that statement was made in-person, a wire fraud violation can be satisfied when "a defendant 'knowingly causes' another to make a wire transmission if the defendant knows that a wire transmission will occur in the ordinary course of business or where the use of wires could be reasonably foreseen." *United States v. Ratliff-White*, 493 F.3d 812, 818 (7th Cir. 2007) (citing *Am. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999) and *United States v. Alexander*, 135 F.3d 470, 475 (7th Cir. 1998)). Here, Plaintiff alleges that DePinto made the announcement to solicit enrollment to Chicago UOTP, which would naturally lead to tuition payments and enrollment forms. Given the presumably large sums of tuition money and the prevalence of mailing or submitting enrollment forms electronically, the Court can reasonably infer that a wire or mail transfer occurred.

Finally, there are sufficient facts to infer intent to defraud. Besides the alleged knowledge that DePinto was aware that the Chicago campus lacked authority to grant degrees, her actions

involving surreptitiously swapping the name of the degree-issuing institution in Ali's enrollment papers suggest some conscious misbehavior to hide or prolong the fraudulent scheme. *See In re Beyond Meat, Inc., Protein Content Mktg. & Sales Pracs. Litig.*, 2024 WL 726838, at *13 (N.D. Ill. Feb. 21, 2024) (citing *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018)); *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 864–65 (N.D. Ill. 2021) (finding that the plaintiff alleged "a plausible inference of intent" to deceive where he "alleged that MAM seeks to convince consumers to buy its products based on its advertising campaign around their safety and benefits for children" and "know[s] the state of the science including the studies that are critical of orthodontic pacifiers"). Thus, the Court declines to dismiss DePinto from this action.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss DePinto from this case, but GRANTS the motion for the remaining Defendants without prejudice.


Virginia M. Kendall
United States District Judge

Date: August 7, 2024